UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VENITA COLBERT,<br><br>              Plaintiff,<br><br>              v.<br><br>JOHN E. POTTER,<br><br>              Defendant. | Civil Action 04-996 (HHK) |

**MEMORANDUM OPINION**

Plaintiff, Venita Colbert, brings this action against defendant John E. Potter in his official capacity as Postmaster General of the United States Postal Service ("Postal Service" or "USPS"). Colbert alleges violations of Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act of 1967, ("ADEA"), 29 U.S.C. § 621 *et seq.*; and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 790 *et seq*.  Colbert alleges that USPS, her employer at all times relevant to the complaint, discriminated against her on the basis of race, sex, age, disability, and in retaliation for engaging in protected equal employment opportunity ("EEO") activity.  USPS now moves to dismiss or in the alternative for summary judgment [#4]. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that USPS' motion must be granted.

**I.  FACTUAL BACKGROUND**

Colbert is an African-American woman over 40 years old who suffers from degenerative disk disease, "a painful back ailment which is aggravated by certain types of physical activity." Compl. ¶ 5.  She began her employment with the United States Postal Service on June 10, 1985. By 1992, Colbert had been promoted to Supervisor of the Telephone Operators, at an EAS-15

grade and pay level, within USPS' national headquarters at L'Enfant Plaza in Washington, D.C. *Id*. ¶ 7.  In this position, she received favorable performance reviews, promotions and increases in pay until 1995.  *Id*. ¶ 8.  In 1994, USPS hired Billy Wesson as Manger of Headquarters Facility Services.  His responsibilities included telephone operations, placing Colbert under his supervision. *Id*. ¶ 9.  Shortly after Wesson arrived, Colbert allegedly began experiencing discriminatory treatment at his hands.

According to Colbert, Wesson "favored and handed out promotional opportunities to males, who like himself, had a military background," while treating Colbert and other African-American women under his management unfavorably.  *Id*. ¶ 11.  Colbert further alleges that Wesson was hypercritical of her work, consistently made demeaning comments, questioned her use of leave, praised others but not her for good performance, and imposed conditions on her that were not imposed on other employees.  *Id*. ¶ 12.

Colbert perceived that Wesson was either trying to harass her into resigning or setting her up for termination, so she began to explore opportunities to be "detailed" to other departments at USPS headquarters.  *Id*. ¶14.  When Colbert discussed her desire for a work detail and its associated promotional and training opportunities with Wesson, he responded that "he could demote her to a custodial position on the night shift" at a lower grade and pay level.  *Id*. ¶ 15. Colbert persisted in her efforts, and in early 1998 she found a detail to the Employment Development office as a training development specialist.  Colbert needed to get Wesson's approval in order to take the detail.  Wesson, however, bristled at this idea, and ordered Colbert not to contact the manager in Employee Development.  A few days later, on April 7, 1998, Wesson gave Colbert a "developmental assignment" to the mail room as "Supervisor, Mail Messenger," telling Colbert that she would have to take this assignment before she could be considered for the

Employee Development detail. At the same time as he assigned Colbert to the mail room, Wesson appointed four African-American men, younger than Colbert and with military backgrounds, to "higher positions at higher pay levels." *Id*. ¶¶ 16-20.

After completing the mail room assignment, mostly consisting of physical labor which aggravated her degenerative disk disease, Colbert obtained her detail to Employee Development in August 1998. She received higher pay at the EAS-21 level, and acquired job duties in line with her education, experience, and desires. Wesson, however, interfered with Colbert's prospects for permanent employment with Employee Development, and in February 1999 demanded that she return to his department. *Id*. ¶¶ 22-23. Upon Colbert's return, Wesson immediately sent her out on a detail to the purchasing department, recalled her once more, and then assigned her to work in Operating Services, "the manual labor-custodial-maintenance section of Headquarters Facility Services." *Id*. ¶¶ 23-25. Colbert's responsibilities there included restocking first aid kits and cleaning supplies, taking walking tours of the building, and checking the expiration date on fire extinguishers. *Id*. ¶¶26-27. Once again, the job involved physical exertion which inflamed Colbert's back condition. This shuffling of work assignments was "designed and intended . . . to harass her into quitting," *id*. ¶ 28 , and effectively "divested [Colbert] of her supervisory responsibilities," *id*. ¶ 24.

During July and August 1999, Weston subjected Colbert to a higher level of scrutiny and discipline than he applied to her co-workers, and which "had no basis in official Postal Service personnel policies." *Id*. ¶ 29. Wesson obtained Colbert's work telephone records and accused her of making excessive personal calls while on the job. For this offense, on September 3, 1999 Wesson issued Colbert a proposed Letter of Warning in lieu of a seven day time off suspension. *Id*. ¶¶ 29-33. When Colbert appealed this disciplinary action on September 15, 1999, Wesson

"became angry and loud," *id*. ¶ 33.  On September 23, 1999 he sustained the Letter of Warning and threatened Colbert with further discipline if she "continued to use Postal property for personal reasons."  *Id*. ¶ 34.

On September 7, 1999, Colbert initiated precomplaint counseling with the Postal Service's EEO office.  *Id*. ¶¶ 35.  When the EEO counselor sent questions to Wesson as part of the investigation into Colbert's filing, Wesson called Colbert into his office and handed her a memorandum stating that she was now assigned to the position of Purchasing Assistant.  *Id*. ¶ 36. The effect of this "retaliatory" reassignment was to deprive Colbert of the supervisory duties of her previous job and "the benefits that inure to such positions."  *Id*. ¶¶ 37-38.  On November 5, 1999, Colbert initiated a second round of precomplaint counseling for her forced move to the Purchasing Department.  On November 16, 1999, USPS' EEO office notified Colbert of "the unsuccessful results of the precomplaint counseling process" and advised her that she could file a formal complaint.  Colbert did so on December 22, 1999, raising both her initial discrimination complaint and her subsequent charge of retaliation.  The Postal Service issued its Final Agency Decision, denying Colbert's claims, in March 2004, and notified her of her right to seek judicial review in federal district court.  *Id*. ¶ 39.  Plaintiff then filed this lawsuit on June 18, 2004.

## II. ANALYSIS

### A. Standard of Review

USPS has filed a motion to dismiss or in the alternative for summary judgment.  Because the court looks to materials outside the pleadings in resolving the motion, the court will treat the motion as one for summary judgment.  *See Zuurbier v. MedStar Health, Inc.*, 306 F. Supp. 2d 1, 5 (D.D.C. 2004) (citing Fed. R. Civ. P. 12(b)).  Under Fed. R. Civ. P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits

show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a summary judgment motion, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor.  *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Anderson,* 477 U.S. at 249-50.

**B.  Statute of Limitations**

Federal employees, including Postal Service employees, may only bring Title VII lawsuits if they file within 90 days of receipt of notice of final administrative action.[1]  42 U.S.C. § 2000e-

---

[1] The Final Agency Decision issued by USPS includes the following notice: "If you are dissatisfied with the Postal Service's final decision in this case, you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of the Postal Service's final decision." Pl.'s Opp'n, Ex. 1 at 9.
Unlike Title VII, which specifies the window within which plaintiffs must bring suit, the ADEA provision applicable to federal employees, 29 U.S.C. § 633a(c), "makes no mention of a limitations period." *Price v. Greenspan*, __ F. Supp. 2d __, 2005 WL 1492201 at *7 (D.D.C. 2005).  However, "most circuits hold that when a federal employee pursues an age discrimination claim through the administrative process," as Colbert has here, "that employee faces the 90 day statute of limitations" applicable to Title VII "because Title VII offers the most analogous statutory regime and limitations period." *Id.* (citing *Rossiter v. Potter*, 357 F.3d 26, 29-30 (1st Cir. 2004); *Burzynski v. Cohen,* 264 F.3d 611, 619 (6th Cir. 2001); *Jones v. Runyon*, 32 F.3d 1454, 1456 (10th Cir. 1996) (other citations omitted)).  In addition, Equal Employment Opportunity Commission regulations provide that "a complainant . . . is authorized under Title VII, the ADEA and the

16(c); *Mondy v. Secretary of the Army,* 845 F.2d 1051 (D.C. Cir. 1998). The 90-day requirement operates as a statute of limitations rather than as a jurisdictional bar, *id.* at 1057, and as such is "subject to equitable doctrines of waiver, estoppel, and tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Although the court may thus toll the statute of limitations in "extraordinary and carefully circumscribed instances," *Mondy*, 845 F.2d at 1057, in the absence of a recognized equitable consideration, "the court cannot extend the limitations period by even one day." *Anderson v. Local 201 Reinforcing Rodmen*, 886 F. Supp. 94, 97 (D.D.C. 1995) (citation omitted); *see also, e.g., Smith v. Dalton*, 971 F. Supp. 1 (D.D.C. 1997) (dismissing suit filed 91 days after plaintiff received final agency decision).

     Colbert claims that she never received USPS' Final Agency Decision. Pl.'s Opp'n at 13. She does not, however, claim to be ignorant of the decision; she admits that her attorney received a copy. When a plaintiff pursuing a Title VII claim is represented by counsel, the 90-day period begins to run when counsel receives the final agency decision and right-to-sue notice. *Josiah-Faeduwor v. Communications Satellite Corp.*, 785 F.2d 344, 345 (D.C. Cir. 1986); *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92 (1990) (receipt by counsel is imputed to client, for to "read the term 'receipt' to mean only 'actual receipt by the claimant' would render the practice of notification through counsel a meaningless exercise."); *Rao v. Baker*, 898 F.2d 191, 196-97 (D.C.

---

Rehabilitation Act to file a civil action in an appropriate United States District Court . . . [w]ithin 90 days of receipt of the final action" if no administrative appeal has been filed. 29 C.F.R. § 1614.407; *see also Tyler v. Henderson*, 2001 WL 194930 at *4 (D.D.C. Feb. 22, 2001) (applying 90-day limitation period to ADEA claims); *Simpkins v. Wash. Metro. Area Transit Auth.*, 2 F. Supp. 2d 52, 53-54, n.2 (D.D.C. 1998) (applying 90-day limitation period to ADEA and Rehabilitation Act claims).

     Colbert's underlying EEO complaint alleged discrimination on the same grounds as the instant complaint – race, sex, age, and disability. Accordingly, the court applies the 90-day limitation period to all of the claims Colbert asserts in her complaint.

Cir. 1990) (plaintiff charged with constructive notice of agency decision when his attorney received decision); 29 C.F.R. § 1614.606(d) ("When the complaint designates an attorney as representative . . . time frames for receipt of materials shall be computed from the time of receipt by the attorney."). Because there is no dispute that Colbert was represented by counsel throughout the complaint process, absent some showing to the contrary Colbert is deemed to have had notice of USPS' Final Agency Decision upon receipt by her attorney.

While there is no dispute that Colbert's counsel received USPS' Final Agency Decision, the parties disagree on the date she received the decision. Although receipt of the agency decision is normally presumed to occur three days after issuance, *Powell v. Wash. Metro. Area Transit Auth.*, 238 F. Supp. 2d 160, 163 (D.D.C. 2002) (citing *Baldwin Co. Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n.1 (1984)), in this case the Postal Service's Final Agency Decision is undated. *See* Def.'s Mot. to Dismiss/Summ. J., Ex. 16. USPS attaches to the Final Agency Decision a "U.S. Postal Service Certified Mail Receipt" bearing a handwritten date of "3/8/04" with a tracking number "7099 3400 0009 5118 7201," which corresponds to the tracking number listed for the decision and notice sent to Colbert's counsel.[2] *See id*. at 9-10. On the return receipt postcard, the name and signature of Colbert's counsel clearly appears, just above a postmark of "Mar 18 2004." *Id*. On the basis of this evidence, USPS contends that Colbert's counsel received the Final Agency Decision on March 18, 2004 – 92 days before Colbert filed suit, which would render her action untimely. Colbert argues against this calculation, claiming that her attorney instead received the decision on March 20, 2004, because "[p]er her practice, Plaintiff's counsel stamped the date of her receipt of the document on the first page," and her copy of the Final Agency Decision bears a

---

[2]   USPS claims that it issued the Final Agency Decision on March 8, 2004. Def.'s Statement of Material Facts ¶ 20.

stamp marked "RECEIVED – Mar 20 2004." Pl.'s Opp'n, Ex. 1. Colbert challenges the March 18, 2004 postmark on the return receipt card, arguing that "the postmark showing the date of mailing would appear on the reverse side of the card in the area where the postage is to be affixed," and that because USPS "has not provided an image of the reverse side of the card," it should be presumed that the reverse of the card bears a postmark with a later date. *Id*. at 14.

Colbert's argument is unpersuasive. She neither disputes that the return receipt card bears her attorney's signature nor challenges the legitimacy of the postmark on the card. Instead, she relies only on her attorney's "practice" of date-stamping mail upon receipt to support her assertion that the complaint is timely. In the absence of any affidavit or other evidence that would contravene the return receipt postmark, the court deems Colbert's counsel to have received the Final Agency Decision on March 18, 2004, making this action untimely. Colbert presents no argument to support equitable tolling of the 90-day statute of limitations, so her complaint must be dismissed.

### III. CONCLUSION

For the foregoing reasons, the court grants USPS' motion to dismiss or in the alternative for summary judgment. An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

Dated: July 27, 2005